[No. F005611. Fifth Dist. Aug. 27, 1986.]

THE PEOPLE, Plaintiff and Respondent, v.
RUDY MENDIETA, Defendant and Appellant.

**COUNSEL**

John Doyle, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Eddie T. Keller, Eileen Ceranowski, Wm. George Prahl and Gelacio Bayani, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**PAPADAKIS (V. N.), J.***—

### STATEMENT OF THE CASE

Defendant Rudy Mendieta appeals his conviction of robbery (count I; Pen. Code, § 211) and three counts of assault with a deadly weapon (counts II, III and IV; Pen. Code, § 245, subd. (a)(1)) and findings that as to count I he personally used a deadly weapon within the meaning of Penal Code section 12022, subdivision (b), and that a principal in the offense was armed with a firearm within the meaning of Penal Code section 12022, subdivision (a).

### FACTS

On December 17, 1984, at 6:30 p.m., defendant and another man entered Jimmy's Market in Madera. Defendant, while holding a knife, jumped Jimmy Amerine. Defendant's companion pointed a gun at Marie Amerine and attempted to open the cash register. Marie fled and defendant asked Jimmy to open the register. Defendant then removed approximately $6,000 in cash and checks.

The robbers had been in the store earlier on the 17th at approximately 3 p.m. Later in the day, a store customer, Augustine Arteaga, greeted de-

---

*Assigned by the Chairperson of the Judicial Council.

fendant and spoke with him briefly when defendant and another man were outside the store. Arteaga left the store at approximately 7 p.m. Marie was also familiar with defendant as one of the persons associated with a black Volkswagen automobile of which she had been suspicious about three weeks prior to the incident. Marie had taken down the license number of the Volkswagen at that time and then provided it to the sheriff's officers who investigated the robbery.

On December 19, 1984, Detective Sergeant Fred Flores of the Madera County Sheriff's office, accompanied by Jimmy, located the black Volkswagen. It was parked at a house in Caruthers, California, associated with a Christian Outreach organization which operated as a residential-type incarceration facility. Before arriving at the Caruthers house, however, Sergeant Flores and Jimmy had first gone to the Madera house operated by the association. Jimmy saw the five Mexican male residents at that house but did not identify anyone. At the Caruthers house, Jimmy viewed four residents and identified defendant and Phillip Rosas as the men who had robbed his store.

Defendant and Rosas were detained and transported to the sheriff's office. Arteaga was then called to view the persons. He identified defendant as the man he had spoken to at the market, but failed to identify Rosas. Defendant was then placed under arrest, and after being advised of his *Miranda* rights, defendant provided an alibi. A search of the Caruthers house the following day failed to yield any evidence of the money, checks, knife or gun.

## DEFENSE

Defendant worked at the turkey ranch operated by the Jensen family in Caruthers on December 17, 1984. He finished work about 4:30 p.m. and then returned to the Outreach house at approximately 4:30 or 5:15 p.m. Defendant watched some football, had dinner, and then participated in Bible study at 7 p.m. The residents were not allowed to leave the premises without a pass. The black Volkswagen had not been in an operating condition for at least a month prior to the date of the robbery. Defendant denied commission of the crimes and testified that he had never been to Jimmy's Market. The supervisor of the group home stated that some of the "brothers" went to Jimmy's to use the phone and to buy groceries.

## DISCUSSION

*Did the trial court err in allowing the prosecution to introduce into evidence the preliminary hearing testimony of Arteaga?*

Arteaga's testimony at the preliminary hearing was through a Spanish language interpreter. At trial, Detective Sergeant Fred Flores acted out the

part of Arteaga in response to questions by the court and counsel. Defendant contends that Arteaga was not "unavailable" under Evidence Code section 240, subdivision (a)(5), and that the admission into evidence of his preliminary hearing testimony was thus error.

■ Under Evidence Code section 240, a witness is unavailable when he or she is "[a]bsent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process." Prior testimony of such a witness, although hearsay, may be admissible under Evidence Code section 1291. ■ The question raised by defendant is whether the prosecution exercised the reasonable diligence (sometimes called "due diligence") required by Evidence Code section 240. However, the question of reasonable diligence is a factual one and will not be disturbed on appeal unless there has been an abuse of discretion by the trial court. (*People* v. *Enriquez* (1977) 19 Cal.3d 221, 235 [137 Cal.Rptr. 171, 561 P.2d 261, 3 A.L.R.4th 73].)

■ What constitutes reasonable diligence in procuring a witness's presence at trial?

"In establishing 'due diligence' it is not enough to show that the witness has not been found, but there must be evidence of a substantial character to support the conclusion of due diligence. [Citations.] It contemplates something more than a desultory and indifferent search, but connotes persevering application and untiring efforts in good earnest. [Citations.]" (*People* v. *Benjamin* (1970) 3 Cal.App.3d 687, 696 [83 Cal.Rptr. 764], disapproved on other grounds in *People* v. *Brigham* (1979) 25 Cal.3d 283, 292 [157 Cal.Rptr. 905, 599 P.2d 100].)

In the instant case, the record establishes that a subpoena was prepared for service upon Augustine Arteaga commanding his presence at defendant's trial commencing on March 25, 1985. Arteaga apparently lived in the Madera area at the time he testified at the preliminary hearing on January 18, 1985. At or about the time of the preliminary hearing, he advised the chief investigating officer, Detective Fred Flores, that he would be leaving the area and would be going up north to the State of Washington. Flores did not recall what date Arteaga said he would be leaving. He stated that when he got there he would call Jimmy and give him the address where he could be contacted. Flores was subsequently informed by Jimmy where Arteaga could be located, but Flores did not recall when he was given the telephone number.

The trial date of March 25, 1985, was set on February 22, 1985. It was not established whether Arteaga departed for Washington before or after

February 22. The court believed he had gone by sometime in early March. There was apparently no attempt, however, despite Arteaga's early notice, to serve a subpoena on Arteaga before his departure.

Fred Flores had talked with Arteaga by telephone at Arteaga's relative's residence in Washington, and Arteaga indicated he would appear at trial if he were provided with transportation. Although an address for Arteaga's relative was established at least two weeks prior to trial, the record does not indicate whether Flores ever attempted to establish an address for Arteaga. A prepaid airline ticket possibly was secured by the district attorney, according to Flores, to accomplish the transportation of Arteaga from the State of Washington to Madera. The last time Flores spoke to Arteaga was four or five days before trial. Two additional calls were made to Washington by Detective Flores when he did not hear from Arteaga regarding transportation. Detective Flores was unable to speak with Arteaga, but messages were left and Flores was awaiting a return call. Flores's only method of contact was through Arteaga's relatives since neither an address nor a telephone number had been established for Arteaga.

Detective Flores was the only law enforcement officer who made any effort to secure Arteaga's presence. No attempt was ever made by anyone to serve the subpoena on Arteaga at his relative's address, no assistance was sought from local law enforcement in Washington, and no attempt was made to secure Arteaga's attendance at trial pursuant to the Uniform Act to Secure the Attendance of Witnesses From Without a State in Criminal Proceedings.[1]

Defendant contends failure to utilize the uniform act is a failure of reasonable diligence and cites 1 Jefferson, Evidence Benchbook (2d ed. 1982) section 2.5, pages 127-128, in support of his position. This court, however, need not reach this conclusion. ■ Here, the prosecution failed to establish even that Arteaga could not be served with a subpoena while still in California.

In justifying a "show up" identification by Arteaga two days after the crimes were committed, Flores testified: "There's always several reasons

---

[1]Penal Code section 1334.2 provides in pertinent part as follows: "If a judge of a court of record in any state, which by its laws has made provision for commanding persons within that state to attend and testify in this state, issues a certificate under the seal of the court that there is a criminal prosecution pending in the court, or that there is a grand jury investigation, that a person within this state is a material witness in such prosecution or grand jury investigation, and that his presence will be required for a specified number of days, then, upon presentation of the certificate to a judge of a court of record in the county in which the person is, a time and place for a hearing shall be fixed by the judge and he shall make an order directing the witness to appear at the hearing."

why I do what I do when I come to illegal aliens, Mexicans from Mexico. One of them is I am never sure they are going to be around the next day to testify and help me out in my investigation. . . . [T]hese individuals were residing in a place where if they move away, then they would be gone the next day . . . ." This statement clearly shows the prosecution was on notice that Arteaga may not appear.

Further evidence of a lack of diligence is demonstrated by Flores's testimony regarding the prepaid airline ticket. On direct examination, Flores testified:

"Q. Did you talk to Mr. Arteaga?

"A. Yes I have.

". . . . . . . . . . . . . . . . . . . . . . . . . .

"Q. Was an airline ticket prepaid to this area issued for him to pick up?

"A. Yes, it was.

"Q. Was he supposed to contact you regarding the means of transportation or where he was to obtain the ticket on that? Did you receive any contact?

"A. No, I haven't personally."

On cross-examination, Flores testified he spoke with Arteaga ". . . a couple of times. I don't know exactly when it was. The last time it was four or five days ago." Defense counsel continued:

"Q. When was this prepaid ticket sent up to him?

"A. I don't know. The District Attorney takes care of that.

"Q. You personally didn't take care of that?

"A. No, I don't know.

"Q. So you don't know if that prepaid ticket was sent up weeks ago or four or five days ago?

"A. No, I don't."

No evidence was offered in support of reasonable diligence other than a copy of an unsigned and unserved subpoena to "AUGUSTINE ARTEAGA c/o Fred Flores—NET FRANCIS ARTEAGA." No one was ever called from the district attorney's office to demonstrate that the promised transportation was ever provided.

In synopsis, Flores did not recall, or failed to determine, any of the important dates, such as when Arteaga told him he was leaving, the date Arteaga intended to leave, when Arteaga actually left or when he received Arteaga's Washington telephone number. He also failed to determine whether the airplane tickets were actually sent or whether Arteaga had his own address. As stated earlier, reasonable diligence connotes a persevering application and untiring efforts in good earnest. Here, the prosecution showed nothing more than a desultory and indifferent search, relying almost entirely on Arteaga's own efforts in assuring his attendance at trial.

■ Having determined the prosecution failed to establish due diligence in this case, the next question is whether the record establishes that the introduction of Arteaga's preliminary hearing testimony was harmless to defendant beyond a reasonable doubt. (*In re Montgomery* (1970) 2 Cal.3d 863, 868 [87 Cal.Rptr. 695, 471 P.2d 15].) While Arteaga was not an eyewitness to the robbery, he did testify that he observed defendant at Jimmy's Market just before the robbery occurred. This corroborated the only other evidence of defendant's guilt—the victims' identification testimony that defendant was present at the store prior to the robbery and that defendant committed the robbery. Defendant's defense was misidentification and alibi. He had a number of witnesses corroborate his alibi. There was no physical evidence, such as the "loot," the weapons used or fingerprints, which indicated defendant's guilt.[2] Thus, the jury may have placed much reliance on Arteaga's testimony, since he was the only "neutral" witness who placed defendant at the scene of the crime. It cannot be said that the error in admitting Arteaga's testimony was harmless beyond a reasonable doubt.[3]

In view of our disposition herein, it is unnecessary to reach Mendieta's other contentions because the issues raised therein should not occur at his retrial.

---

[2]Defendant presented expert witness testimony that the only usable fingerprints lifted at the scene did not match defendant's or the other suspect's fingerprints.

[3]Defendant requests that this court take judicial notice of the minutes in the case of People v. Phillip Rosas (Super. Ct., Madera County No. 6401) wherein Arteaga's testimony was not admitted into trial and Rosas was acquitted as the accomplice of defendant in his robbery and assault trial. Because we cannot declare belief that the error was harmless beyond a reasonable doubt, it is unnecessary to consider defendant's judicial notice request.

The judgment is reversed.

Hanson (P. D.), Acting P. J., and Hamlin, J., concurred.